Nott, Ch. J.,
delivered the opinion of the court:
In the leading case of The United States v. The State of New York (160 U. S. R., 598) the Supreme Court laid down and established certain principles which are applicable to this case and those of the other States, and which control and determine the rights and liabilities of the parties.
First, the Supreme Court decided that a State which acted at the request of the President and under the Act Mth July, 1861 (12 Stat. L., 276), in enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting-troops to be employed in aiding to suppress the insurrection of the civil war, was acting by the authority of the United *144 States and on their behalf. When one man acts for another at his request and by his authority, it is a case of agency; and when the loyal States took up the work of enrolling and raising troops for the service of the United States they became pro hac vice the agents of the General Government.
The Supreme Court also decided that as such agents it was within the scope of their authority for the States to borrow money in their own name wherewith to carry out the purposes of the statute; and that it was proper for them to borrow money by issuing their own bonds for that purpose.
Finally, the Supreme Court decided that the interest which the States paid for borrowed money or upon their own bonds was recoverable within the intent of the act of indemnity, not as interest on an account between debtor and creditor, but as an expenditure properly made by an agent in the administration of his agency for the use and benefit of his principal.
It is elementary that when an agent mingles the business of his principal with his own, and mingles the funds which ho receives from his principal with his own, he assumes all responsibility in regard to them and must account for them. If the bank fails’ in which he deposits the money of his principal with his own, and as a part of his own account, it is his loss, and to that extent the relation of debtor and creditor subsists between himself and his principal. But it is also elementary that where an agent keeps the business of his principal distinct from his own, and does not mingle the money of his principal with his own, and acts within the scope of his authority, and in good faith, and with reasonable prudence and by ordinaiy business methods, his acts are the acts of his principal, and the account is the account of his principal, and the risks are the risks of his principal.
There are two accounts between the parties. But the forms and conveniences and necessities of bookkeeping do not affect their legal rights. The first account was for procuring a loan by the agent for the use of the principal, with its necessary incidental costs and expenses; the second was for the expenditure of the money after it had been borrowed. Since the decision of the Supreme Court in the case of the State of New York it has been apparent that two accounts *145 were not necessary — that all of the payments made by a State, whether for arms or for interest, were equally expenditures, and might have been embraced in one account. But the restricted construction which the accounting' officers gave to the act of indemnity forbade them to adjust the entire account, and their action ultimately forced the separation of the transactions into a loan account and an expenditure account. This latter account has been adjusted and settled by the parties through the accounting officers of the Treasury and is not now before the court. The former account constitutes the subject-matter of the suit, and is exclusively the account with which the court must now deal.
The transactions which constitute the items of account are simply these:
Th'e State of Rhode Island, as has been said, borrowed money to be expended for the United States, and to that end made short loans and issued its own bonds, bearing interest at 6.per cent and having a long time to run. It is insisted by the claimant that this element of time was practically for the benefit of the United States, as it enabled the State of Rhode Island to borrow at 6 per cent at a time when the State of New York, issuing short-time bonds, was compelled to pay T. But that fact docs not enter into the question we are now considering.
When all of the transactions between the parties are summed up, they show that the State expended all of the money which it received from the United States, and more besides. What that balance of expenditure is which the United States should pay under the act of indemnity is now the matter to be determined by the court, and the controversy concerning it begins with the question, At what time should the direct tax of the United States, authorized by the Act of August 3, 1861 (12 Stat. L., 292), and assumed by the State of Rhode Island, be treated as a payment upon this loan account?
The act of August 5, section 53, provided, where the direct tax on the inhabitants of a State had been assumed by the State, that if it should be paid to the United States on or before the 30th of June of any j’ear the State should be entitled to a reduction of 15 per cent; and if it should be paid on or before *146 the 1st of September, that the State should be entitled to a reduction of 10 per cent. The statute also provided, in effect, that where a State held a demand against the United States which had been settled and liquidated by the accounting officers of the Treasury it should be regarded, with certain formalities prescribed, as the payment of so much cash upon the direct tax indebtedness of the State. The Act of May 13, 186£ (12 Stat. L., 384), somewhat modified this by providing that if a State held such a demand against the United States on the 30th of Juno which had not yet been settled and liquidated by the accounting officers it should be applied, upon subsequent liquidation, as if it actually had been liquidated at the prescribed date. Taking the two statutes together, the plain import of them seems to be this: The act of 1861 contemplated a continuing direct tax system with an annual tax period or year running from the 1st of April of one year to the 1st of April of the next. The tax was payable at any time within that year. A provision, frequently to be met with in taxpaying communities and in mercantile transactions, allowed an “abatement” if the tax should be paid before it was due, i. e., within a certain prescribed time. The proscribed time within which a State might become entitled to an abatement of 15 per cent expired on the 30th of June, and within which it might become entitled to an abatement of 10 per cent on the 1st of September. After the 1st of September the whole of the tax must be paid.
There was also, as has been said, a provision in the act of 1861 allowing a State to sot off its liquidated demands against the United States and have them treated as a cash payment of or upon the direct tax; but between the 5th of August, 1861, and the 13th of May, 1862, it became apparent that the immense volume of business thrown upon the accounting officers by the war would prevent them from settling and liquidating these accounts in due time, and would thereby deprive the States from receiving the benefit of the provision in the act of 1861' to which they were justly entitled. To remedy this injustice, caused b3r the inability of their own officers to adjust accounts within the prescribed time, the United States consented, through Congress, by the act of the 13th of May, *147 1862, that 'where a State should perform its part of the bai-gain — that is, should present an account within the prescribed time — the subsequent liquidation thereof shohld operate retroactively, as if it had been made on the 30th of June. The act of the 13th of May, 1862, did not lessen the liability of a State for a tax assumed or change the time when it became due and payable. All that it did was to preserve for each State its account as a set-off and authorize the liquidation thereof nunc pm tunc.
Turning now to the account between the State of Rhode Island and the United States, we find that the direct tax was voluntarily assumed ly the State. On the 30th of June, 1862, the State unquestionably owed the General Government this direct tax, if it would claim the abatement of 15 per cent. On that day it should have treated that reduced amount as money received from its principal and have credited it in its loan account and deposited it in the bank where the moneys for the use of the United States were kept and with it proceed to buy bonds and stop the running of interest. Instead of doing so the State retained the money in its own hands. On January 14, 1863, the State treasurer entered the amount of the tax, less the abatement of 15 per cent, on his journal to the credit of the United States. Subsequently, in 1867, it was brought into the account between the State and the United-States by the accounting officers as a credit in their adjustment of the expenditure account.
It seems apparent to the court that a credit for this reduced amount of $93,418.11, if the State is to have the benefit of the abatement, should have been given to the United States on the 30th of June, and that the State must be regarded as then having money of the United States in its hands which it should have applied upon the interest-bearing account of the United States. The Auditor, folio wing the accounting officers, has given the credit as of January 4, 1867.
We now come to the matter of the accounting.
At the beginning of the war, in April, 1861, the general assembly of Rhode Island adopted a resolution directing the general treasurer to keep a separate account of the expendi *148 tures made on account of the Rhode Island troops. The resolution is in these words:
“Resolved, That the general treasurer be, and he hereby is, directed to open and keep a separate account of all expenditures of money made by this State in executing- any requisition which has been made, or hereafter shall be made, by the President of the United States for all or any part of the military force of this State, to enter into the service of the United States.”
Pursuant to the resolution the State treasurer opened a separate account for all military expenditures under the name of the “Military department,” and kept the funds of the military department distinct from the general funds of the State and on deposit in a bank. If in this bank had been deposited only the moneys borrowed for the use of the United States and the moneys received from the United States, and against them had been drawn only checks for expenditures properly chargeable to the United States, there would have been a strictly principal and agent’s account, which, it might be claimed, would now constitute the account between the parties. But, unfortunately for the State, the account included all of its military transactions. The fund was kept distinct from the ordinary funds of the State, and the money paid in or paid out was all for war purposes; but it was not all for the war purposes of the United States as defined and limited by the act of indemnity.
The court has patiently endeavored to verify the balance which the State seeks to recover, $252,861.11, but is constrained to say that the transactions of the State for the State and of the State for the United States were so mingled that the one can not be separated from the other with the certainty that is requisite for a judicial ascertainment of the facts involved.
The Auditor has made up an alternative account, stating a balance due to the State of Rhode Island of $150,303.83, and has calculated therein interest upon the assumption that the money was borrowed on the same day that it was expended, and that the money received from the United States was immediately applied to the purchase of bonds. But in fact there was a constant overlapping at each end of the account. *149 The State had to borrow before it bought, and when it received money from the United States’it had to wait until it could buy bonds for sale at par. Consequently, it had to pay interest which this account does not show or include. For the reasons before stated we are constrained to take this account of the Auditor as the basis of the recovery.
There are two columns of amounts in this account, the first of which represents money expended for enrolling and equipping troops, which is the account settled bjr the accounting-officers; the second, the interest computed on loans from the day when the State expended each item of money in the purchase of military supplies to the day when the United States made a payment upon account.
On the 18th of October, 1861, the United States paid the State of Bhodo Island $231,478.51. The Auditor has properly made a rest in the account at that date and credited the money to the United States, and has brought down an interest-bearing balance to the credit of the State, as of that date, of $100,829.69. But the deduction is made exclusively from the first column — from the moneys expended in equipping-troops.
The counsel for the United States contends that as the money paid — $231,478.51—-was allowed by the accounting-officers on an account for expenditures in equipping troops, it should be applied exclusively to that side of the account. But the accounting officers declined to consider the loan account, and their action could overturn neither the terms of the statute nor the decision of the Supreme Court. The terms of the statute were, in effect, that the United States should reimburse the State for all expenditures properly made on their behalf, and the decision of the Supreme Court was that interest paid on loans was as much an expenditure made for the United States as money paid for military equipments. Under that decision the State is entitled to have that payment applied to the total and not to a part of its advances for the United States. When this is done the State will be entitled to a credit of an interest-bearing balance at that date of $106,821.18 instead of $100,829.69.
On the 30th of June, 1862, the direct tax became payable, and to entitle the State to the abatement of 15 per cent, a *150 second rest in the account should have been made on that day and a credit given to the United States of $99,418.11. This was not done until January 4,1867, and in that particular the account is erroneous. This deduction, it is perhaps need! ess to say, should be made from the whole amount then due to the State of Rhode Island both for expenditures and upon loans.
The subsequent rests and credits made and given by the Auditor are correctly made in point of time, but, like the above, should be deducted from the whole amount then due.
To the account thus corrected and restated should be added the expense to which the State was put in preparing and engraving bonds to be sold for the benefit of the United States. This amount has been settled by computation and the agreement of counsel at $878.78.
The court has had the foregoing corrections and computations made and decides, as its conclusion of law, that the final balance due from the United States to the State of Rhode Island upon the accounting before referred to is $146,154.45.
The findings of fact and the opinion filed on the 11th of November, 1901, will be withdrawn from the files and the findings and opinion now filed will be transmitted to the Sec-rotary of the Treasury.